# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

NANCY HELMOLD and
DAMARY SANTANA,
Individually and on behalf of all others
similarly situated in Illinois,
Massachusetts, Florida, Michigan,
Minnesota, Missouri, New Jersey,
New York and Washington

        Plaintiffs

v.                                  Case No. 25-cv-377

ABBOTT LABORATORIES, INC.,

        Defendant

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Nancy Helmold and Damary Santana (collectively "Plaintiffs"), by their counsel, allege the following upon information and belief, except for allegations pertaining to Plaintiffs, which are based on personal knowledge:

## BACKGROUND FACTS

1.     The American Academy of Pediatrics (AAP) has, for many years, recommended that infants be breast fed for the first 12 months of life.[1]

2.     For those infants for whom breastfeeding is not possible or desired, there are regulated, FDA-approved infant formulas. Infant formula is defined as "a food . . . for special dietary use for infants [0-12 months] by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk." 21 C.F.R. § 106.3.

---

[1] Jennifer L. Pomeranz, Maria J. Romo Palafox, and Jennifer L. Harris. "Toddler drinks, formulas, and milks: Labeling practices and policy implications." Preventive medicine 109 (2018): 11-16 (citing American Academy of Pediatrics (AAP) Committee on Nutrition and World Health Organization (WHO) findings).

3.      After 12 months, experts recommend whole plain cow's milk, along with water and healthy food, as part of a balanced diet.[2]

4.      "Feeding infants and toddlers, including the transition from only breastfeeding or infant formula with iron, to the regular family diet is "critical for establishing healthy dietary preferences and preventing obesity in children."[3]

5.      Since 2006, rates of breastfeeding have increased, resulting in a decrease in sales of infant formula.[4]

6.      To make up for declining sales of infant formulas, Defendant and other makers of infant formula have introduced products marketed as "transition formulas," "follow-on formulas," "weaning formulas," "toddler milks" and "toddler drinks" to toddlers aged 12 to 36 months.[5]

7.      Available market data shows that advertising spending on "transition formulas" quadrupled between 2006 and 2015, and since 2018 the sales of "toddler milks" nationwide have averaged over $500 million per year.[6]

---

[2] Lott M, Callahan E, Welker Duffy E, Story M, Daniels S. Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations. Technical Scientific Report. Healthy Eating Research; 2019. Available at: http://healthyeatingresearch.org.

[3] Jennifer L. Harris, and Jennifer L. Pomeranz, "Infant formula and toddler milk marketing: opportunities to address harmful practices and improve young children's diets." Nutrition Reviews (2020).

[4] Fuchs GJ, Abrams SA, Amevor AA, et al; American Academy of Pediatrics, Committee on Nutrition. Older Infant-Young Child "Formulas". Pediatrics. 2023:152(5).

[5] Jennifer L. Pomeranz, Maria J. Romo Palafox, and Jennifer L. Harris. "Toddler drinks, formulas, and milks: Labeling practices and policy implications." Preventive medicine 109 (2018): 11-16.
Attia, S., Fuchs, G., Toddler Formula, Young Child Formula, Growing Up Milk: The Wild West of Young Child Nutrition, J. Pediatric Gastroenterol Nutr. 2023:401.

[6] Choi YY, Ludwig A, Harris JL. US toddler milk sales and associations with marketing practices. Public Health Nutr. 2020; 23(6):1127–1135; Dinesh Thakur, U.S. Baby Infant Formula Market, 2018-2032, Allied Market Research Report A10849 (2022)

8.    "Toddler milks," like FDA-regulated infant formulas, are milk powders with added nutrients, are generally sold in the same size metal cans as FDA-regulated infant formulas, are labeled similarly to FDA-regulated infant formulas, and are sold on the same shelves in stores as FDA-regulated infant formulas, even though toddlers aged 12 to 36 months have different dietary needs from infants aged 0 to 12 months.

9.    Toddler milk products contain higher saturated fat and sodium and "added sweeteners, including sugar, glucose syrup solids, and honey"—added sugars that are not recommended for children under the age of two."[7]

### Defendant Misleads Consumers That Its "Toddler Drinks" Are Appropriate for Children Over 12 Months

10.    Defendant Abbott Laboratories ("Defendant" or "Abbott") has for decades manufactured, distributed and marketed infant formula under the brand name "Similac".

11.    For more than four years preceding the filing of this Complaint, and continuing today, Defendant has also manufactured, distributed, and marketed two milk-based powders, "Go & Grow Toddler Drink by Similac" and "Pure Bliss Toddler Drink by Similac," purporting to meet, and be necessary for, the nutritional needs of children between 12 and 36 months ("Toddler Drinks").

12.    The labels of Defendant's infant formulas and Defendant's "Toddler Drinks" are deliberately similar:

---

[7] J. Harris, F. Fleming-Milici, et al., Baby Food FACTS Nutrition and marketing of baby and toddler food and drinks, UConn Rudd Center for Food Policy & Obesity January 2017, p. 6.







13.     Defendant's "Toddler Drinks" are also labeled "stage 3" so as to imply to caregivers that they are the next nutritionally recommended product for them to purchase after infant formula, which is numbered "stage 1" and supplemental formula, which is numbered "stage 2." In fact, "Toddler Drinks" are not nutritionally recommended at all.[8]  Experts recommend that children above

_____

[8] The use of such a numbering system runs contrary to the recommendations of the American Academy of Pediatrics and the World Health Organization. Fuchs GJ, Abrams SA, Amevor AA, et al; American Academy of Pediatrics, Committee on Nutrition. Older Infant-Young Child "Formulas". Pediatrics. 2023:152(5); World Health Organization. Infant and young child feeding. Available at: https://www.who.int/news-room/fact-sheets/detail/infant-and-young-child-feeding.

12 months be given plain cow's milk, as well as water and healthy foods.

 

14.     Thus, Defendant's "Toddler Drinks" area labeled in a manner designed to give caregivers of toddlers the false impression that the product is nutritionally appropriate for children in the targeted age group – 12 to 36 months – when in fact they are not.[9]

### Defendant's Labels Mislead Consumers By Emphasizing Health, Not Sugar

15.     As Abbott is well aware, consumers seek out and prefer healthful foods and beverages, especially for their children, and are willing to pay more for, or purchase more often, products marketed and labeled as healthy. For instance, a Nielsen 2015 Global Health & Wellness Survey found that "88% of those polled are willing to pay more for healthier foods."[10]

16.     Abbott is a sophisticated marketing company that leverages this knowledge in its marketing strategy for its "Toddler Drinks," prominently touting on their labels the respects in which these products are healthy and nutritious.

---

[9] *See* Maria J Romo-Palafox and JL Pomeranz et al., "Infant formula and toddler milk marketing and caregiver's provision to young children," Journal of Maternal and Child Nutrition, vol. 16,3 (2020).

[10] Nancy Gagliardi, "Consumers Want Healthy Foods—And Will Pay More For Them," *Forbes* (Feb. 18, 2015) (citing Neilson, Global Health & Wellness Survey, at 11 (Jan. 2015)).

17. The label of Defendant's "Go & Grow Toddler Drink by Similac" represents that it provides "28 Important Nutrients for Growth and Development," as well as "Immune Support," "Brain Development," "Digestive Health," "5 HMO Prebiotics," "DHA," "Lutein," "Vitamin E" and "Total Care," and does *not* contain "artificial growth hormones," "GMOs," or "Palm Olein Oil."

18. The label of Defendant's "Pure Bliss Toddler Drink with Probiotics by Similac" represents that it contains "Probiotics," "DHA," and "Milk from Grass-Fed Cows," and does *not* contain "added corn syrup solids," "artificial growth hormones," "antibiotics," or "GMOs."

19. These representations, individually and especially in combination, are designed and intended to convince consumers that Defendant's "Toddler Drinks" are healthy food choices and will benefit health rather than detract from it.

20. In fact, the labeling of Defendant's "Toddler Drinks" causes caregivers to make inaccurate and ill-advised nutritional purchasing decisions. For example, one study of caregiver attitudes concluded that 52% expected products like Defendant's "Toddler Drinks" to "give toddlers nutrition that they wouldn't get from other sources."[11]

21. 70% of persons surveyed believed that products like Defendant's "Toddler Drinks" were suitable for toddlers, despite expert recommendations that they offer "no unique nutritional value beyond what could be achieved through a nutritionally adequate diet; furthermore, they contribute added sugars to the diet."[12]

22. Contrary to the recommended nutritional needs of children in this age range, Defendant's "Toddler Drinks" contain added sugars. Defendant's "Go & Grow Toddler Drink" contains 4 grams of added sugar per serving, which represents 16 calories out of 70 calories per serving,

---

[11] Maria J Romo-Palafox and JL Pomeranz et al., Marketing claims on infant formula and toddler milk packages: What do caregivers think they mean? , UCONN Rudd Center for Food Policy & Obesity, September 2019.

[12] *Id.*

6

or 22.9% added sugar. Defendant's "Pure Bliss Toddler Drink" contains 4 grams of added sugar per serving, which represents 16 calories out of 80 calories per serving, or 20% added sugar.

 

23. The recommendation by key national health and nutrition organizations for children above 12 months is *zero* added sugar.[13]

24. Children who are exposed to added sugars tend to consume more sugars as adults. Specifically, children who consume beverages with added sugars are expected to have greater intakes of sweetened beverages as well as sweetened dairy products as adults.[14]

25. Indeed, although there is a vast body of scientific evidence demonstrating that consuming sugar sweetened beverages harms rather than supports overall health—and immune, heart, and digestive health in particular—Defendant adds up to 4 grams of sugar per serving to its "Toddler Drinks." In light of this sugar content, Abbott's representations that its "Toddler Drinks" are nutritious

---

[13] Consensus Statement, Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations, Robert Wood Johnson Foundation, Healthy Eating Research, Sept. 2019. *See also* Maria J Romo-Palafox and JL Pomeranz et al., "Infant formula and toddler milk marketing and caregiver's provision to young children," Journal of Maternal and Child Nutrition, vol. 16,3 (2020).

[14] Liem DG, Mennella JA. Sweet and sour preferences during childhood: role of early experiences. Dev Psychobiol. 2002; 41(4):388–395

and healthy are false and misleading.

26.     The claims on the labels of Defendant's "Toddler Drinks" are false and misleading because they focus on the products' purported health benefits while omitting information regarding the health harms of their added sugar content.

27.     Although, as with Abbott's "Toddler Drinks," "[sugar sweetened] beverages are often fortified with added nutrients that are advertised as providing health benefits, including vitamins, minerals and other herbals," in reality, "the sugar content and potential adverse effects of some additives outweigh any potential benefit these ingredients may provide, especially among youth."[15] Accordingly, "[l]imiting SSBs has been widely promulgated by public health policy and scientific documents as a prudent strategy for promoting optimal nutrition and health."[16] Even a cursory review of the scientific record demonstrates why this is so.

### Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Cardiovascular Heart Disease and Mortality

28.     The scientific literature demonstrates that consumption of sugar-sweetened beverages has deleterious effects on heart health.

29.     In a study of preschool children published in January 2020, researchers found that higher consumption of sugar-containing beverages was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of [sugar-containing beverages] in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[17]

---

[15] Pirotin S., Becker C., Crawford PB, "Looking beyond the marketing claims of new beverages: Health risks of consuming sport drinks, energy drinks, fortified waters and other flavored beverages," Atkins Center for Weight and Health, UC Berkeley (2014) [hereinafter "Pirotin, Looking beyond the marketing claims of new beverages"].

[16] Zheng, M., et al., "Substitution of SSB with other beverage alternatives," Academy of Nutrition and Dietetics (2015).

[17] Eny, KM, et al., "Sugar-containing beverage consumption and cardiometabolic risk in preschool

8

30.

Consumption of beverages with added sugars should be avoided in order to avoid long- term threats to cardiovascular health. "[M]ost US adults consume more added sugar than is recommended for a healthy diet. A higher percentage of calories from added sugar is associated with significantly increased risk of CVD mortality. In addition, regular consumption of sugar-sweetened beverages is associated with elevated CVD mortality."[18]

31.     Sugar-sweetened beverage consumption is also associated with several CHD risk factors. For example, consumption of sugary beverages has been associated with dyslipidemia,[19] obesity,[20] and increased blood pressure.[21]

**Scientific Evidence Demonstrates Sugar-Sweetened Beverage Consumption Impairs the Immune System**

32.     The scientific literature demonstrates that consumption of sugar-sweetened beverages has deleterious effects on immune system function.

33.     First, neutrophils are the most common type of white blood cell (leukocytes) and they

---

children." *Prev. Med. Reports* 17 (Jan. 14, 2020).

[18] Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults," *JAMA*, at E8 (pub. online, Feb. 3, 2014).

[19] Elliott S.S., et al., "Fructose, weight gain, and the insulin resistance syndrome," *Am. J. Clin. Nutr.*, Vol. 76, No. 5, pp. 911-22 (2002).

[20] Faith, M.S., et al., "Fruit Juice Intake Predicts Increased Adiposity Gain in Children From Low-Income Families: Weight Status-by-Environment Interaction," *Pediatrics*, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Schulze, M.B, et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women," *JAMA*, Vol. 292, No. 8, pp. 927-34 (2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"]; Ludwig, D.S., et al., "Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis," *Lancet*, Vol. 257, pp. 505-508 (2001); Dennison, B.A., et al., "Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity," *Pediatrics*, Vol. 99, pp. 15-22 (1997).

[21] Hoare, E., et al., "Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk," *Nutrients*, Vol. 9, No. 10 (2017).

act as the immune system's first line of defense. Neutrophils ordinarily protect the body by traveling to the source of an infection or pathogen where they digest and destroy invading microorganism. But consuming sugar-sweetened beverages like the challenged Toddler Drink products causes blood sugar to rise quickly. This in turn activates an enzyme called protein kinase C, which leads to dysfunction in neutrophils significantly reducing the ability of this important part of the immune system to protect the body and fight off infection.[22]

34.     Second, high blood sugar is associated with the inability of immune cells to properly "tag" foreign pathogens so they can be destroyed.[23]

35.     Third, high blood sugar contributes to multiple defective immune responses, including a decrease in IL-6, a chemical messenger necessary for a proper immune response.[24]

36.     Accordingly, Abbott's marketing its Toddler Drinks as providing "Immune Support" is false, or at least highly misleading.

## The Added Sugar in Toddler Drinks Harms the Gut Microbiota

37.     Scientific evidence demonstrates that sugar-sweetened beverage consumption harms gut microbiota and the gut barrier. Diet plays a central role in shaping the microbiota that make up the gut biome in human digestive tracts. In fact, studies "suggest that diet has a dominant role over other possible variables such as ethnicity, sanitation, hygiene, geography, and climate, in shaping the gut microbiota."[25]

---

[22] Jafar N, et al., "The Effect of Short-Term Hyperglycemia on the Innate Immune System," *Am. J. Med. Sci*. Vol. 351(2), 201-11 (Feb. 2016).

[23] Margaret K. Hostetter, "Handicaps to Host Defense: Effects of Hyperglycemia on C3 and Candida albicans," *Diabetes* 1; 39 (3): 271–275 (Mar. 1990).

[24] Spindler MP et al., "Acute hyperglycemia impairs IL-6 expression in humans," *Immun. Inflamm. Dis*. 19;4(1):91-7 (Jan. 2016).

[25] De Filippo, C., et al., "Impact of diet in shaping gut microbiota revealed by a comparative study in children from Europe and rural Africa," *PNAS*, Vol. 107, No. 33, 14691-14696 (August 17, 2010) [hereafter "De Filippo, Diet-Induced Dysbiosis of the Intestinal Microbiota"]; *see also* Brown, K, et

10

38.     Studies also show that certain types of nutrients have specific effects on the gut microbiota. Relevant here, "diets rich in simple sugars favor the expansion of [harmful microbial] organisms"[26] in at least four separate ways. First, simple sugars serve as a nutrient for harmful bacteria and "[r]ecent studies have shown that high intake of sugars increase the relative abundance of [harmful] Proteobacteria in the gut, while simultaneously decreasing the abundance of [beneficial] Bacteroidetes."[27] Second, high sugar diets result in "lost gut microbial diversity."[28] Third, because consuming sugar increases bile output, "[r]efined sugars," also "mediate the overgrowth of opportunistic[, harmful] bacteria like C. difficile and C. perfringens,"[29] which feed on the bile. Fourth, sugar "can impact gut colonization by the microbiota independently of their ability to serve as nutrients" since both "fructose and glucose silence a critical colonization factor, called Roc, in a widely distributed gut commensal bacterium B. thetaiotaomicron."[30]

---

al., "Diet-Induced Dysbiosis of the Intestinal Microbiota and the Effects on Immunity and Disease," *Nutrients* 4, 1095-1119 (2012) ("the composition of the gut microbiota strongly correlates with diet as demonstrated by a study assessing the relative contributions of host genetics and diet in shaping the gut microbiota" "dietary changes could explain 57% of the total structural variation in gut microbiota whereas changes in genetics accounted for no more than 12% This indicates that diet has a dominating role in shaping gut microbiota").

[26] Townsend II, G., et al., "Dietary sugar silences a colonization factor in a mammalian gut symbiont," *PNAS*, Vol. 116, No. 1, 233-238 (January 2, 2019) [hereinafter "Townsend II, Dietary sugar silences a colonization factor"].

[27] Satokari, R., "High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria," *Nutrients* 12(5), 1348 (published online May 8, 2020) [hereinafter "Satokari, High Intake of Sugar"].

[28] Ho Do, M., et al., "High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders in Mice without Body Weight Change," *Nutrients* 2018, 10, 761 (June 13, 2018) [hereinafter "Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders "]; *see also* Jian-Mei Li, et al., "Dietary fructose-induced gut dysbiosis promotes mouse hippocampal neuroinflammation: a benefit of short-chain fatty acids," *Microbiome*, 7, Article No. 98 (June 29, 2019) ("The abundance of Bacteroidetes was significantly decreased and Proteobacteria was significantly increased in fructose-fed mice") [hereinafter "Jian-Mei Li, Dietary fructose-induced gut dysbiosis"].

[29] De Filippo, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.25.

[30] Townsend II, Dietary sugar silences a colonization factor, *supra* n.26 ("dietary simple sugars can

39.     These changes in the gut microbiota composition harm digestive health and increase risk of chronic digestive tract conditions. Specifically, "[e]vidence suggests that the composition of the intestinal microbiota can influence susceptibility to chronic disease of the intestinal tract including ulcerative colitis, Crohn's disease, celiac disease and irritable bowel syndrome "[31]

40.     In sum, "high sugar intake may stagger the balance of microbiota to have increased pro-inflammatory properties and decreased [] capacity to regulate epithelial integrity and mucosal immunity. Consequently, high dietary sugar can, through the modulation of microbiota, promote metabolic endotoxemia, systemic (low grade) inflammation and the development of metabolic dysregulation and thereby, high dietary sugar may have many-fold deleterious health effects, in addition to providing excess energy." [32]

41.     Accordingly, Abbott's marketing of its Toddler Drinks as supporting "Digestive Health" is false, or at least highly misleading.

**Added Sugar in Toddler Drinks Harms the Gut Barrier**

42.     "The gut barrier consists of a specialized, semi-permeable mucosal, and epithelial cell layers that are reinforced by tight junction proteins. Among other functions, this barrier serves to regulate nutrient and water entry and prevents the entry of harmful compounds into extra-luminal tissues" and the blood.[33]

43.     When the permeability of the gut or epithelial barrier is increased, this "allows for the influx of adverse substances and may ultimately contribute to the development of metabolic disorders,

---

suppress gut colonization in a commensal bacterium just by altering the levels of a colonization factor [know as Roc] dispensable for the utilization of such sugars.").

[31] De Filippo, Diet-Induced Dysbiosis of the Intestinal Microbiota, *supra* n.25.

[32] Satokari, High Intake of Sugar, *supra* n.27.

[33] Noble, E., et al., "Gut to Brain Dysbiosis: Mechanisms Linking Western Diet Consumption, the Microbiome, and Cognitive Impairment," *Front Behav. Neurosci.* 11:9 (January 30, 2017).

and cognitive dysfunction."[34]

44.     "A compromised gut barrier makes the intestinal tract potentially vulnerable to the gram-negative bacteria-derived LPS, which upon excess entry into circulation promotes endotoxemia and systemic inflammation."[35]

45.     Both fructose and glucose increase gut barrier permeability.

46.     First, "[a]lthough dietary fructose was thought to be metabolized exclusively in the liver, evidence has emerged that it is also metabolized in the small intestine and leads to intestinal epithelial barrier deterioration."[36] A high fructose diet, for example, has been found to result in the "thinning of the intestinal mucosa, epithelium, and muscularis mucosae," and the "loss of crypts and glands," among other harmful effects.[37] This "increase[d] intestinal permeability" "precedes the development of metabolic endotoxemia, inflammation, and lipid accumulation, ultimately leading to hepatic steatosis and normal-weight obesity." [38] In addition, "fructose can escape absorption in the small intestine and reach the microbiota in the distal gut, where microbiota-derived products of fructose metabolism enter the host blood."[39] Thus, "excessive fructose consumption" has been shown to "result[] in barrier deterioration, dysbiosis, low-grade intestinal inflammation, and endotoxemia."[40]

---

[34] *Id.*

[35] *Id.* (Studies have found "elevated plasma levels of a gavaged fluorescent molecule (FITC-dextran) that is typically unable to cross the gut barrier.").

[36] Febbraio, M., et al., "'Sweet death': Fructose as a metabolic toxin that targets the gut-liver axis*," Cell Metab.*7;33(12):2316-2328 (published online October 6, 2021) [hereinafter "Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis"].

[37] Jian-Mei Li, Dietary fructose-induced gut dysbiosis, *supra* n.28.

[38] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.28.

[39] Townsend II, Dietary sugar silences a colonization factor, *supra* n.26.

[40] Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.36.

In short, consuming fructose, like that in the Toddler Drinks, has numerous harmful effects on the gut barrier.[41]

47.     Glucose also harms the gut barrier. For example, both a "[high glucose diet] and [high fructose diet] increased gut permeability and disrupted the gut barrier."[42] This harms digestive tract health because "damaged gut barriers" lead to endotoxins crossing the epithelial and into the blood stream, resulting in "higher [blood] plasma endotoxin levels."[43]

48.     Moreover, high levels of glucose in the blood, known as "[h]yperglycemia[,] markedly interfere[s] with homeostatic epithelial integrity, leading to abnormal influx of immune-stimulatory microbial products and a propensity for systemic spread of enteric pathogens."[44] This happens, at least in part, because "hyperglycemia causes retrograde transport of glucose into intestinal epithelial cells via GLUT2, followed by alterations in intracellular glucose metabolism and transcriptional reprogramming."[45] In short, "experiments establish hyperglycemia as a direct and specific cause for

---

[41] *See* Satokari, High Intake of Sugar, *supra* n.27 ("consuming high amounts of sugar harms the gut by "increasing small intestinal permeability in healthy humans,"); Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.28 ("diet induced changes in the gut microbiota affect the expression of tight junction proteins and inflammatory cytokines, which leads to increased gut permeability and inflammation"); Febbraio, Fructose as a metabolic toxin that targets the gut-liver axis, *supra* n.36 ("fructose, . . . led to the downregulation of enterocyte tight-junction proteins and subsequent barrier deterioration, which is in agreement with previous rodents and human studies (Jin et al., 2014; Kavanagh et al., 2013; Lambertz et al., 2017; Spruss et al., 2012).");  Young-Eun Cho, et al., "Fructose Promotes Leaky Gut, Endotoxemia, and Liver Fibrosis Through Ethanol-Inducible Cytochrome P450-2E1–Mediated Oxidative and Nitrative Stress," *Hepatology*, Vol. 73, Issue 6, June 2021, 2180-2195 (April 8, 2019) ("fructose intake causes protein nitration of intestinal [tight-junction] and AJ proteins, resulting in increased gut leakiness, endotoxemia, and steatohepatitis with liver fibrosis").

[42] Ho Do, High-Glucose or -Fructose Diet Cause Changes of the Gut Microbiota and Metabolic Disorders, *supra* n.28.

[43] *Id.*

[44] Thaiss, C., et al., "Hyperglycemia drives intestinal barrier dysfunction and risk for enteric infection," *Science* 359, 1376–1383 (March 23, 2018) ("We have identified glucose as an orchestrator of intestinal barrier function.").

[45] *Id.*

intestinal barrier dysfunction and susceptibility to enteric infection,"[46] such that "[b]lood glucose concentrations are associated with microbial product influx in humans[.]" [47]

49.    Moreover, because consuming "[s]ugar has [ ] been shown to irritate the lining of the stomach and intestine," it actually "compromises digestive function and the absorption of nutrients" and can "induce diarrhoea [sic], which may lead to further loss of nutrients."[48]

### **Excess Sugar Consumption Causes Type 2 Diabetes**

50.    Diabetes affects 25.8 million Americans, and can cause kidney failure, lower-limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[49]

51.    In 2010, Harvard researchers also performed a meta-analysis of 8 studies concerning sugar-sweetened beverage consumption and risk of type 2 diabetes, involving a total of 310,819 participants. They concluded that individuals in the highest quantile of SSB intake had an average 26% greater risk of developing type 2 diabetes than those in the lowest quantile.[50] Moreover, "larger studies

---

[46] *Id.*

[47] *Id.* (Human studies "suggest that similar to their effects in mice, serum glucose concentrations, rather than obesity, may associate with or potentially even drive intestinal barrier dysfunction in humans.").

[48] DiNicolantonio JJ, Berger A., "Added sugars drive nutrient and energy deficit in obesity: a new paradigm," *Open Heart* (2016) [hereinafter "DiNicolantonio, Added sugars drive nutrient and energy deficit"].

[49] Aranceta Bartrina, J. et al., "Association between sucrose intake and cancer: a review of the evidence," *Nutrición Hospitalaria*, Vol. 28 (Suppl. 4), 95-105 (2013); Garcia-Jimenez, C., "A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose," *Journal of Molecular Endocrinology*, Vol. 52, No. 1 (2014); Linden, G.J., "All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study," *Journal of Clinical Periodontal*, Vol. 39, No. 1, 940-46 (October 2012).

[50] Malik, Vasanti S., et al., "Sugar-Sweetened Beverages and Risk of Metabolic Syndrome and Type 2 Diabetes," *Diabetes Care,* Vol. 33, No. 11, at 2477 (Nov. 2010).

with longer durations of follow-up tended to show stronger associations."[51] Thus, the meta-analysis showed "a clear link between SSB consumption and risk of . . . type 2 diabetes."[52]

52.     An analysis of data for more than 50,000 women from the Nurses' Health Study,[53] during two 4-year periods (1991-1995, and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day (*i.e.*, 140-150 calories and 35-37.5 grams of sugar), had an 83% greater relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month, and women who consumed 1 or more fruit punch drinks per day had a 100% greater relative risk of type 2 diabetes.[54]

53.     The result of this analysis shows a statistically significant linear trend with increasing sugar consumption.[55]

54.     Most convincingly, an econometric analysis of repeated cross-sectional data published in 2013 established a causal relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statically-

---

[51] *Id.* at 2481.

[52] *Id.*

[53] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 women registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *at* http://www.channing.harvard.edu/nhs.

[54] Schulze, Diabetes in Young & Middle-Aged Women, supra n. 20, at 927-34.

[55] Hu, F.B., et al., "Sugar-sweetened beverages and risk of obesity and type 2 diabetes: Epidemiologic evidence," *Physiology & Behavior*, Vol. 100, 47-54 (2010).

significant 11-fold difference.[56]

## Sugar-Sweetened Beverage Consumption is Associated with Increased Risk of Obesity

55.     Excess added sugar consumption leads to weight gain and obesity because insulin secreted in response to sugar intake instructs the cells to store excess energy as fat. This excess weight can then exacerbate the problems of excess added sugar consumption, because excess fat, particularly around the waist, is in itself a primary cause of insulin resistance, another vicious cycle. Studies have shown that belly fat produces hormones and other substances that can cause insulin resistance, high blood pressure, abnormal cholesterol levels, and cardiovascular disease. And belly fat plays a part in the development of chronic inflammation in the body, which can cause damage over time, and without any signs or symptoms.

56.     A meta-analysis by Harvard researchers evaluating change in Body Mass Index per increase in 1 serving of sugar-sweetened beverages per day found a significant positive association between beverage intake and weight gain.[57]

57.     One study of more than 2,000 2.5-year-old children followed for three years found that those who regularly consumed sugar-sweetened beverages between meals had a 240% better chance of being overweight than non-consumers.[58]

58.     An analysis of data for more than 50,000 women from the Nurses' Health Study during two 4-year periods showed that weight gain over a 4-year period was highest among women who

---

[56] Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevelance: An Econometric Analysis of Repeated Cross-Sectional Data," *PLOS Online*, Vol. 8, Issue 2 (February 27, 2013).

[57] Malik, V.S., et al., "Sugar-sweetened beverages and BMI in children and adolescents: reanalyses of a meta-analysis," *Am. J. Clin. Nutr.*, Vol. 29, 438-39 (2009).

[58] Dubois, L., et al., "Regular sugar-sweetened beverage consumption between meals increases risk of overweight among preschool-aged children," *J. Am. Dietetic Association*, Vol. 107, Issue 6, 924-34 (2007).

increased their sugar-sweetened beverage consumption from 1 or fewer drinks per week, to 1 or more drinks per day (8.0 kg gain during the 2 periods), and smallest among women who decreased their consumption or maintained a low intake level (2.8 kg gain).[59]

59.     A study of more than 40,000 African American women over 10 years had similar results. After adjusting for confounding factors, those who increased sugar-sweetened beverage intake from less than 1 serving per week, to more than 1 serving per day, gained the most weight (6.8 kg), while women who decreased their intake gained the least (4.1 kg).[60]

60.     Experimental short-term feeding studies comparing sugar-sweetened beverages to artificially-sweetened beverages have shown that consumption of the former leads to greater weight gain. In one 10-week trial involving more than 40 men and women, the group that consumed daily supplements of sucrose (for 28% of total energy) increased body weight and fat mass—by 1.6 kg for men and 1.3 kg for women—while the group that was supplemented with artificial sweeteners lost weight—1.0 kg for men and 0.3 kg for women.[61]

**Authoritative Bodies Recommend Excluding or Substantially Minimizing Added Sugar Consumption, Especially in the Form of Sugar-Sweetened Beverages**

61.     Because of the scientific evidence of added sugar's health harms, the FDA has proposed defining "healthy" foods as foods whose added sugar contributes no more than 5% of their calories.  The FDA recently published a proposed rule "to update the definition for the implied nutrient content claim 'healthy' to be consistent with current nutrition science and Federal dietary guidance,

---

[59] Schulze, Diabetes in Young & Middle-Aged Women, *supra* n.20.

[60] Palmer, J.R., et al., "Sugar-Sweetened Beverages and Incidence of Type 2 Diabetes Mellitus in African American Women," *Archive Internal Med.*, Vol. 168, No. 14, 1487-82 (July 28, 2008).

[61] Raben, A., et al., "Sucrose compared with artificial sweeteners: different effects on ad libitum food intake and body weight after 10 wk of supplementation in overweight subjects," *Am. J. Clini. Nutr.*, Vol. 76, 721-29 (2002).

especially the Dietary Guidelines for Americans (Dietary Guidelines), regarding how consumers can maintain healthy dietary practices."[62] In doing so, the FDA explained, "[e]vidence shows" that "a diet low in added sugars helps individuals achieve a healthy dietary pattern" such that "it is critical that foods" labeled as "'healthy' do not contribute to a dietary pattern that contains added sugars over the recommended levels."[63]

62.     In order to achieve this, the FDA has proposed "a limit on the amount of added sugars in foods bearing the nutrient content claim 'healthy' to help consumers choose foods that will contribute to a healthy dietary pattern that is lower in added sugars, consistent with current nutrition science and Federal dietary guidance."[64] That limit, "[f]or individual foods," was found to be "≤5 percent of the DV [for added sugar] per [Reference Amount Customarily Consumed]," which is "≤2 ½ g for adults and children 4 years of age and older[]."[65] In sum, FDA has concluded the scientific evidence supports limiting added sugar to just 5% of calories, or 2.5 grams, in individual foods marketed as healthy due to their nutrient content.

63.     The most recent 2020-2025 Dietary Guidelines for Americans state that for individuals 2 to 18 years old, sugar-sweetened beverages "are not necessary in the child or adolescent diet nor are they a component of the USDA Dietary Patterns. . . . Decreasing consumption of sugar-sweetened beverages to reduce added sugars intake will help youth achieve a healthy dietary pattern. Beverages that contain no added sugars should be the primary choice for children and adolescents."[66]

---

[62] 87 Fed. Reg. 59168, 59168 (Sept. 29, 2022).

[63] *Id.* at 59180.

[64] *Id.*

[65] *Id.*

[66] U.S. Dep't of Health & Human Servs. and U.S. Dept. of Agric., "Dietary Guidelines for Americans 2020 –2025," at 87 (8th ed.), *available at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf.

64.     The 2020-2025 Dietary Guidelines for Americans further state that "[m]ost adults' diets include choices across multiple food groups that are not in nutrient-dense forms and therefore cannot accommodate excess calories from sweetened beverages. Intake of sugar-sweetened beverages should be limited to small amounts and most often replaced with beverage options that contain no added sugars, such as water."[67]

65.     Numerous other authoritative bodies recommend significantly limiting added sugar and sugar-sweetened beverage consumption. The World Health Organization (WHO) recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar.[68] Additionally, WHO expressly advises "limiting the consumption of . . . sugar-sweetened beverages (i.e. all types of beverages containing free sugars – these include carbonated or non-carbonated soft drinks, fruit or vegetable juices and drinks, liquid and powder concentrates, flavoured water, energy and sports drinks, ready-to-drink tea, ready-to-drink coffee and flavoured milk drinks)[.]"[69]

66.     The American Heart Association recommends restricting added sugar to 5% of calories.[70] Based on the average caloric needs, this equates to 12 grams daily for children 4 to 8 years old, up to 25 grams for children up to 18 years old, 25 grams for women, and 38 grams for men. A single Toddler Drink (22g added sugar) thus contains almost twice the daily sugar limit for children 4 to 8 years old, 88% of the daily limit older children and women, and 57% of the daily limit for men.

67.     The Heart and Stroke Foundation, in explaining "healthy eating basics," recommends

---

[67] *Id.* at 102.

[68] World Health Organization, "Healthy Diet," *available at* https://www.who.int/news-room/fact-sheets/detail/healthy-diet.

[69] *Id.*

[70] Johnson, R.K., et al., on behalf of the American Heart Association Nutrition Committee of the Council on Nutrition, Physical Activity, and Metabolism and Council on Epidemiology and Prevention, "Dietary Sugars Intake and Cardiovascular Health: A Scientific Statement From the American Heart Association," *Circulation*, Vol. 120, 1011-20, at 1016-17 (2009).

"avoid[ing] sugary drinks."[71]

68.     The Centers for Disease Control and Prevention warns that "[t]oo much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease" and that "[s]ugary drinks are the leading source of added sugars in the American diet."[72]

69.     Public health research has shown that use of products such as the Defendant's "Toddler Drinks" results in prolonged use of expensive, re-branded, powered milk with added sugars instead of transitioning infants to cow's milk, water and other healthy foods. Under World Health Organization standards, the transition to family foods is critical for preventing obesity in young children.[73]

70.     According to the Consensus Statement, Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations, published by the Robert Wood Johnson Foundation, Division of Healthy Eating Research in September 2019, products like Defendant's "Toddler Drinks" are close to four times more expensive than whole cow's milk, the recommended alternative and a nutritionally superior choice.[74]

71.     Defendant's "Toddler Drinks" are sold at a premium price, approximately $.75 per 15-gram serving, which is far more than the value that Plaintiffs and the other members of the Class received. The value of the products Plaintiffs purchased was materially less than the value represented by Defendant.

---

[71] Heart and Stroke Foundation, Healthy eating basics, https://www.heartandstroke.ca/healthy-living/healthy-eating/healthy-eating-basics.

[72] Centers for Disease Control and Prevention, Know Your Limit for Added Sugars, https://www.cdc.gov/healthyweight/healthy_eating/sugar.html.

[73] World Health Organization, Guidance on Ending the Inappropriate Promotion of Foods for Infants and Young Children, 2017 (Recommendation 1).

[74] Consensus Statement, Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations, Robert Wood Johnson Foundation, Healthy Eating Research, Sept. 2019.

72.     Had Plaintiffs and the members of the Class known the truth, they would not have bought the products or would have paid less for them.

73.     Defendant's branding and packaging of its "Toddler Drinks" is designed to – and does – deceive, mislead, and defraud Plaintiffs and other consumers.

74.     Defendant sold more of its "Toddler Drinks" at higher prices than it would have in the absence of this deception, resulting in additional profits at the expense of consumers.

## JURISDICTION AND VENUE

75.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from the Defendant.

76.     The Court has personal jurisdiction over Defendant Abbott Laboratories because it is incorporated in Illinois, and has purposely availed itself of the benefits of conducting business activities in Illinois through the promotion, marketing, distribution and sale of its Toddler Drinks in Illinois as well as other states.

77.     Venue is proper in the Northern District of Illinois pursuant to 28 USC §1391 because Defendant resides in this district, because many of the acts giving rise to this action occurred in this district, and the Defendant has purposely availed itself of the benefits of conducting business activities in this district through the promotion, marketing, distribution and sale of its Toddler Drinks in this district.

## PARTIES

78.    Plaintiff Damary Santana is a citizen of Charlestown, Massachusetts, who purchased the Defendant's Pure Bliss Toddler Drink for household use, specifically for consumption by her 1-year old toddler, paying over $30 per can for the product.

79.    Plaintiff Nancy Helmold is a citizen of Chicago, Illinois, who purchased the Defendant's Pure Bliss Toddler Drink for household use, specifically for consumption by her 2-year-old toddler, paying over $30 per can for the product

80.    Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois.

81.    During the relevant statutes of limitations for each cause of action alleged, each Plaintiffs purchased the Defendant's Toddler Drink product in reliance on the Defendant's representations about the product.

82.    Each Plaintiff purchased the product at the above-referenced price believing that it was necessary and/or valuable to the nutritional needs of his/her toddler.

83.    Each Plaintiff was deceived by and relied upon the product's deceptive labeling.

84.    Each Plaintiff would not have purchased the product in the absence of Defendant's misrepresentations and omissions.

85.    The product was worth less than what each Plaintiff paid for it and he/she would not have paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ACTION ALLEGATIONS

86.    While reserving the right to redefine or amend the class definitions prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent all persons who purchased any of Defendants' Toddler Drinks, for personal or household use, and not for resale or distribution, at any time within the applicable statute of limitations (the "Class Period") in each of the following states:   Illinois, Massachusetts, Florida, Michigan, Minnesota,

Missouri, New Jersey, New York and Washington.

87.     The members of the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

88.     Questions of law and fact common to Plaintiffs and the Classes include:

• whether Abbott communicated a message through the packaging and advertising of the Toddler Drinks that they are nutritious, balanced, or healthful, that they support immune, digestive, and heart health, that they are nutritionally appropriate for toddlers;

• whether those messages are material, or likely to be material, to a reasonable consumer;

• whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

• whether Abbott's conduct violates public policy;

• whether Abbott's conduct violates state or federal food statutes or regulations;

• whether Abbott was unjustly enriched;

• the proper amount of damages, including exemplary damages;

• the proper amount of restitution; and

• the proper amount of attorneys' fees.

89.     These common questions of law and fact predominate over questions that affect only individual Class Members.

90.     Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Abbott's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the Abbot's Toddler Drinks and suffered economic injury because the products are misrepresented. Absent Abbott's business practice of deceptively and unlawfully labeling its Toddler Drinks, Plaintiffs and Class Members would not have purchased them or would have paid less for them.

91.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

92.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

93.     Abbott has acted on grounds applicable to the Classes, thereby making appropriate final declaratory relief concerning the Classes as a whole.

94.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a) and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Massachusetts Consumer Protection Statute, G.L. c. 93A
### (On Behalf of the Massachusetts Class)

95.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

96.     Plaintiff Santana asserts a claim against Defendant for unfair and deceptive trade practices pursuant to G.L. c. 93A, § 2 and 9.

97.     Plaintiff Santana and the Massachusetts Class are "persons" within the meaning of G.L. c. 93A, § 1(a) and are entitled to relief under the act in accordance with G.L. 93A, § 9.

98.     Defendant is engaged in "trade and commerce" as defined by G.L. c. 93A, § 1(b).

99.     Plaintiff Santana and the Massachusetts Class entered into consumer transactions by purchasing Toddler Drink products manufactured by Defendant.

100.     In its labeling and representations concerning its Toddler Drink products, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair practices, in the conduct of trade or commerce, in violations of G.L. c. 93A, § 2.

101.     Defendant also engaged in deceptive acts within the meaning of G.L. c. 93A, § 2(a), including by representing that its Toddler Drink products were nutritionally appropriate for toddlers and by representing that those products were healthy and nutritious when in fact they contained added sugars unnecessary and deleterious to the health of the toddlers to whom they were given. Defendant's representations misled Plaintiff Santana and the members of the Massachusetts Class.

102.     Defendant engaged in advertising methods that rendered its advertisements false and misleading, such that Plaintiff Santana and the Massachusetts Class would not have purchased Defendant's Toddler Drink products had they known that Defendants' products were not beneficial or necessary to the health of their toddlers.

103.     Defendant also violated G.L. c. 93A by manufacturing, selling and/or distributing its Toddler Drink products in a defective condition unreasonably dangerous to users and consumers, including Plaintiff Santana and the members of the Massachusetts Class.

104.     As a proximate result of Defendant's violations of G.L. c. 93A, Plaintiff and the members of the Massachusetts Class have suffered damages.

105.     By letter dated August 20, 2024, Plaintiff Santana sent a demand for relief to Defendant, in accordance with § 9(3). Defendant did not respond to Plaintiffs' demand for relief by making a written tender of settlement reasonable for the injuries suffered by Plaintiff Santana and the members of the Massachusetts Class.

**SECOND CAUSE OF ACTION**
**Violation of Massachusetts False Advertising Statute, G.L. c. 266, §91-91B**
**(On Behalf of the Massachusetts Class)**

106.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

107.     Plaintiff Santana asserts a claim against Defendant for false advertising, pursuant to G.L. c. 266, §91-91B.

108.     Defendant, with the intent to sell its Toddler Drink products to the public in Massachusetts, or with the intent to increase the consumption of or demand for those products in Massachusetts, caused, directly or indirectly, to be made, published, disseminated, circulated or placed before the public in Massachusetts, advertising or labeling containing assertions, representations or statements of fact which were untrue, deceptive or misleading, and which such Defendant knew, or might on reasonable investigation have ascertained to be untrue, deceptive or misleading.

109.     As a proximate result of Defendant's untrue, deceptive or misleading statements, Plaintiff Santana and the members of the Massachusetts Class, have suffered damages, including payment for Defendant's Toddler Drink products at prices greater than the fair value of those products.

110.     Plaintiff Santana and the members of the Massachusetts Class are entitled to damages for Defendant's false advertising and labeling of its Toddler Drink products in Massachusetts.

**THIRD CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Law**
**815 Ill. Comp. Stat. § 505/1, et seq.**
**(On Behalf of the Illinois Class)**

111.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

112.    This claim is brought against Defendant for engaging in unfair and/or unconscionable business practices under 815 Ill. Comp. Stat. §505/1, et seq.

113.    Plaintiff Helmold and the members of the Illinois Class are persons within the meaning of the statute, and purchased Defendant's products for personal use.

114.    Defendant misrepresented the substantive, quantitative, qualitative, and/or compositional attributes of its Toddler Drink products.

115.    Plaintiff Helmold and the members of the Illinois Class relied on the statements, omissions and representations of Defendant concerning Defendant's Toddler Drink products, and Defendant knew or should have known the falsity of those statements, omissions and representations.

116.    Plaintiff Helmold and the members of the Illinois Class have suffered damages because they would not have purchased Defendant's Toddler Milk products or paid as much for those products had the true facts concerning those products been disclosed.

**FOURTH CAUSE OF ACTION**
**Violation of Florida Law**
**(On Behalf of the Florida Class)**

117.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

**a. Violation of Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*)**

118.    Plaintiffs and Florida class members are individuals who purchased Defendant's Toddler Drink Products for personal purposes.

119.    Defendants created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither. Defendant made or disseminated misleading advertisements to the general public or to a portion of the general public.

120. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promote them as nutritious and failed to disclose the health risks they posed. These omissions were misleading and deceptive standing alone, and were particularly deceptive in light of the Defendant's advertising of its Products as health choices for toddlers.

121. The Defendant's conduct was unfair and unconscionable in that it included: (1) the manufacture and sale of products for the consumption of toddlers and (ii) misrepresentations and omissions of material facts concerning the characteristics and nutritional value of Toddler Drink Products that offended public policy; were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

122. Defendant's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

123. Plaintiffs and the members of the members of the Florida Class relied on the statements, omissions and representations of Defendant concerning Defendant's Toddler Drink Products.

124. The Defendant's conduct actually and proximately caused actual damages to Plaintiffs and the Florida Class members. Plaintiffs and the members of the Florida Class would not have purchased Defendant's Toddler Drink products or paid as much for those Products had the true facts concerning those Products been disclosed. Plaintiffs seek – on behalf of themselves and

each member of the Class – three times actual damages and reasonable attorney's fees, as well as any other relief the Court may deem just and proper.

### b. Violation of Florida False Advertising Law (Fla. Stat. §§ 817.06 and 817.41, *et seq*)

125. Plaintiff and the class members purchased the Defendant's Toddler Drink products for personal   purposes.

126.  Defendant created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers.  Defendant undertook to portray its Toddler Drink Products as healthy and nutritious, when in fact they were neither.

127.  Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

128.  Defendant's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs.

129.  Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

130.  Plaintiffs and the members of the Florida Class relied on the statements, omissions and representations of Defendant concerning Defendant's Toddler Drink products.

131.  The Defendant's conduct actually and proximately caused actual damages to Plaintiffs and Florida class members. Plaintiffs and the members of the Florida Class would not have purchased Defendant's Toddler Drink products or paid as much for those products had the true facts concerning those products been disclosed. Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages, punitive damages, reasonable attorney's fees, and any other relief the Court may deem just or proper.

**FIFTH CAUSE OF ACTION**
**Violation of Michigan Law**
**(on Behalf of the Michigan Class)**

132. Plaintiffs reallege and incorporate allegations elsewhere in the Complaint as if set forth fully herein.

a. **Violation of Michigan Consumer Protection Act (M.C.L.A. § 445.901, *et seq*.)**

133. Plaintiff and class members are individuals who purchased the Defendant's Toddler Drink product for personal purposes.

134. Defendant created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither.

135. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

136. The Defendant's prohibited fraudulent, deceptive, and unfair business practices conduct includes, but is not limited to the following: (a) representing that the goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have; (b) misrepresenting that Toddler Drink products are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) advertising goods or services with the intent not to sell them as advertised; (d) failing to reveal a material fact, the omission

of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; (e) making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and (f) failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

137. Defendant's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Plaintiffs and the members of the Michigan Class relied on the statements, omissions, and misrepresentations of Defendant concerning Defendant's Toddler Drink products.

138. Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

139. The Defendant's conduct actually and proximately caused actual damages Plaintiffs and Michigan class members to be injured and to sustain losses. Plaintiffs and the members of the Michigan Class would not have purchased Defendant's Toddler Drink products or paid as much for those products had the true facts concerning those products been disclosed. Plaintiffs seek – on behalf of themselves and each member of the class – three times actual damages, equitable relief, and any other relief the Court may deem just or proper.

## SIXTH CAUSE OF ACTION
### Violation of Minnesota Laws
### (on Behalf of the Minnesota Class)

140. Plaintiffs reallege and incorporate allegations elsewhere in the Complaint as if set forth fully herein.

**a. Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69)**

141. Plaintiff and class members are individuals who purchased the Defendant's Toddler Drink product for personal purposes.

142. Defendant created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither.

143. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

144. The Defendant engaged in acts, used, and employed, fraud, false pretenses, false promises, misrepresentations, misleading statements and deceptive practices. The Defendant's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs. Plaintiffs and the members of the Minnesota Class relied on the statements, omissions, and misrepresentations of Defendant concerning Defendant's Toddler Drink products.

145. Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

146. The Defendant's conduct actually and proximately caused injury to Plaintiffs and Minnesota class members. Plaintiffs and the members of the Minnesota Class would not have purchased Defendant's Toddler Drink products or paid as much for those products had the true facts concerning those products been disclosed. Plaintiffs seek – on behalf of themselves and each member of the class – three times damages, attorney's fees and costs, and any other relief the Court may deem just or proper.

147. The cause of action will benefit the public by requiring the Defendant to take accountability for the deceptive sale and marketing of a toddler product to consumers in Minnesota.

**b.     Violation of Minnesota False Statement in Advertising Law (Minn. Stat. § 325F.67)**

148. Plaintiff and the Minnesota class members purchased the Defendant's Toddler Drink product for personal purposes.

149. Defendant created an implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink Products as healthy and nutritious, when in fact they were neither.

150. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed. The omissions were

misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

151. The Defendant has made, published, disseminated, circulated, and placed before the public, and caused to be made, published, disseminated, circulated, and placed before the public advertisements of merchandise for use, consumption, purchase, and sale that contain material assertions, representations, and statements of fact that are untrue, deceptive, and misleading.

160. The Defendant's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs. Plaintiffs and the members of the Minnesota Class relied on the statements, omissions and representations of Defendant concerning Defendant's Toddler Drink products.

161. Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

162. The Defendant's conduct actually and proximately caused injury to Plaintiffs and Minnesota class members. Plaintiffs and the members of the Minnesota Class would not have purchased Defendant's Toddler Drink products or paid as much for those products had the true facts concerning those products been disclosed. Plaintiffs seek—on behalf of themselves and each member of the class—three times damages and attorney's fees and costs, as well as any other relief the Court may deem just or proper.

163. The cause of action will benefit the public by requiring the Defendant to take accountability for the deceptive sale and marketing of a toddler product to consumers in Minnesota.

c.    **Violation of Minnesota False Statement in Advertising Law (Minn. Stat. §**
**325D.43,** *et seq.***)**

164.  Plaintiff and the class members purchased the Defendant's Toddler Drink Products for personal purposes.

165.  Defendant created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither.

166. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

167. The Defendant's conduct includes but is not limited to the following prohibited fraudulent and deceptive business practices: (a) misrepresenting that the goods or services have characteristics or benefits that they do not have; and (b) misrepresenting that Toddler Drink products are of a particular standard, quality, or grade, or that goods of a particular style or model, when they are not; (c) advertising goods or services with intent not to sell them as advertised; and (d) engaging in conduct that creates a likelihood of confusion or misunderstanding.

168. The Defendant's conduct had the capacity to, tendency to, and in fact did, deceive reasonable consumers including the Plaintiffs. Plaintiffs and the members of the Minnesota

Class relied on the statements, omissions, and misrepresentations of Defendant concerning Defendant's Toddler Drink products.

169. The Defendant's conduct actually and proximately caused injury to Plaintiffs and Minnesota class members and is likely to cause injury in the future. Plaintiffs and the members of the Minnesota Class would not have purchased Defendant's Toddler Drink products or paid as much for these products had the true facts concerning these products been disclosed. Plaintiffs seek – on behalf of themselves and each member of the class – three times equitable relief, attorney's fees and costs.

**SEVENTH CAUSE OF ACTION**
**Violation of Missouri Merchandising Practices Act (Rev Stat Section 407.010)**
**(On Behalf of the Missouri Class)**

170.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

171.  Plaintiffs and class members are persons who purchased Defendant's Toddler Drink Products for personal purposes.

172.  Defendant created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither.

173.  Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed.

174.  Defendant's conduct was unfair and unconscionable in that it included misrepresentations and omissions of material facts concerning the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

175.  The Defendant's conduct was unfair and unconscionable in that it included: (i) the manufacture and sale of products for the consumption of toddlers and (ii) misrepresentations and omissions of material facts concerning the characteristics and nutritional value of Toddler Drink that offended public policy; were immoral, unethical, oppressive, outrageous,

unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

176. The Defendant's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. Plaintiffs and the members of the Missouri Class relied on the statements, omissions, and misrepresentations of Defendant concerning Defendant's Toddler Drink products.

177. The Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

178. The Defendant's conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and Missouri class members. Plaintiffs and the members of the Missouri Class would not have purchased Defendant's Toddler Drink products or paid as much for those products had the true facts concerning those products been disclosed. Plaintiffs seek – on behalf of themselves and each member of the class – three times actual damages, punitive damages, attorney's fees, and equitable relief, as well as any other relief the Court may deem just or proper.

## EIGHTH CAUSE OF ACTION
### Violation of New Jersey Law
### (on Behalf of the New Jersey Class)

179. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

**a.    Violation of New Jersey Law Against Fraud, etc.  (N.J. Rev. Stat. §56:8-2, *et seq.*)**

180. Plaintiffs, class members, and the Defendant are each natural persons, corporations, trusts, unincorporated associations or partnerships, and are thus persons under this law.

181. Plaintiffs and class members purchased Toddler Drink products for personal purposes.

182. The Defendant engaged in trade or commerce directly or indirectly affecting the people of New Jersey by advertising, offering for sale, selling, or distributing Toddler Drink products.

183. The Defendant created and implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pervasive pattern of false and misleading statements and omissions directed to consumers. Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither. Defendant made or disseminated misleading advertisements to the general public or to a portion of the general public.

184. The Defendant's unlawful acts and practices occurred in connection with their sales of Toddler Drink products, in commerce directly or indirectly affecting the people of the state of New Jersey.

185. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed.

186. Defendant's conduct was unfair and unconscionable in that it included misrepresentations and omissions of material facts concerning the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed.

187. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of the Defendant's advertising of its product as a healthy choice for toddlers.

188. The Defendant's conduct was fraudulent because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers including the Plaintiffs. The Defendant's conduct thus had the capacity to injure not just Plaintiffs but also other members of the public.

189. Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions. Plaintiffs and the members of the New Jersey Class relied on the statements, omissions, and misrepresentations of Defendant concerning Defendant's Toddler Drink products.

190. The Defendant's conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs and New Jersey class members. Plaintiffs and the members of the New Jersey Class would not have purchased Defendant's Toddler Drink products or paid as much for those products had the true facts concerning those products been disclosed.

191. Plaintiffs seek – on behalf of themselves and each member of the class – three times actual damages and reasonable attorney's fees and costs, as well as any other relief the Court may deem just or proper.

**NINTH CAUSE OF ACTION**
**Violation of New York Laws**
**(on Behalf of the New York Class)**

192.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

a.  **Violation of New York General Business Law Section 349**

193.  Plaintiffs and class members purchased Defendant's Toddler Drink Products for personal purposes.

194.  Defendant created an implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pattern of false and misleadings statements and omissions directed to consumers.  Defendant undertook to portray its Toddler Drink products as healthy and nutritious, when in fact they were neither.

195.  Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed.

196.  Defendant's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs.

197.  Plaintiffs and the members of the New York Class relied on the statements, omissions and representations of Defendant concerning Defendant's Toddler Drink products.

198.  Plaintiffs and the members of the New York Class have suffered damages because they would not have purchased Defendant's Toddler Milk products or paid as much for those products had the true facts concerning those products been disclosed.

199. Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages or statutory damages in the amount of $50, whichever is greater.

b.  **Violation of New York General Business Law Section 350**

200. Plaintiffs and the class members purchased Defendant's Toddler Drink Products for personal purposes.

201. Defendant created an implemented a scheme to create a market for its Toddler Drink Products and substantially increase the sale of those products through a pattern of false and misleading statements and omissions directed to consumers.  Defendant undertook to portray its Toddler Drink Products as healthy and nutritious, when in fact they were neither.

202. Defendant's advertisements for its Toddler Drink Products contained deceptive statements about the healthfulness of the Products, and the labels on the Products promoted them as nutritious and failed to disclose the health risks they posed.

203. Defendant's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, mislead reasonable consumers including the Plaintiffs.

204. Defendant knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

205. Plaintiffs and the members of the New York Class relied on the statements, omissions and representations of Defendant concerning Defendant's Toddler Drink products.

206. Plaintiffs and the members of the New York Class have suffered damages because they would not have purchased Defendant's Toddler Milk products or paid as much for those products had the true facts concerning those products been disclosed.

207. Plaintiffs seek—on behalf of themselves and each member of the class—three times actual damages or statutory damages in the amount of $500, whichever is greater, treble damages and attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(On behalf of all Classes)**

221. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

222. Through the labeling of its Toddler Drinks, Abbott has and has continued to make affirmations of fact or promises, or description of goods, that, *inter alia*, the products offer complete, balanced nutrition, are beneficial to health, and provide specific health benefits.

223. These affirmations and descriptions include:

- "Important Nutrients for Growth and Development"

- "Immune Support"

- "Brain Development"

- "Digestive Health"

- " 5 HMO Prebiotics"

- "Probiotics" and

- "Milk from Grass-Fed Cows,"

224. These representations were "part of the basis of the bargain," in that Plaintiffs and the members of all the Classes purchased the Toddler Drinks in reasonable reliance on those statements.

225. Abbott breached its express warranties by selling Toddler Drinks that do not meet the above affirmations, promises, and product descriptions because scientific evidence demonstrates that a balanced, nutritious diet excludes sugar-sweetened beverages, and otherwise limits added sugar for children above 12 months, whereas regular consumption of the Toddler Drinks is detrimental, rather than beneficial to health.

226. Abbott's breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and Class Members paid for the Toddler Drinks.

227. As a result, Plaintiff seeks, on behalf of themselves and other Class Members, actual damages resulting from Abbott's breaches of express warranty, including, without limitation, expectation damages.

## TWELFTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### (On behalf of all Classes)

228. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth herein.

229. Abbott, through its acts set forth herein, in the sale, marketing, and promotion of the Toddler

Drinks bearing statements outlined in paragraph 223, made representations, that, *inter alia*, the products offer complete, balanced nutrition, are beneficial to health, and provide specific health benefits.

230. Abbott is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there were, in the sale to Plaintiffs and the Class, implied warranties that those goods were merchantable.

231. However, Abbott breached that implied warranty because a balanced, nutritious diet excludes sugar-sweetened beverages for children above 12 months, and otherwise limits added sugar to less than 5% of calories, whereas regular consumption of the Toddler Drinks is detrimental, rather than beneficial to health.

232. As an actual and proximate result of Abbott's conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Abbott to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

233 As a result, Plaintiffs seek actual damages, including, without limitation, expectation damages.

### THIRTEENTH CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of all Classes)

234. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

Plaintiffs plead this claim in the alternative.

234. Plaintiffs and Class Members conferred upon Abbott an economic benefit, in the form of profits resulting from the purchase and sale of the Toddler Drinks.

235. Abbott's financial benefits resulting from their unlawful and inequitable conduct are economically traceable to Plaintiffs' and Class Members' purchases of the Toddler Drinks and the economic benefits conferred on Abbott are a direct and proximate result of its unlawful and inequitable

conduct.

236. It would be inequitable, unconscionable, and unjust for Abbott to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

237. As a result, Plaintiffs and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Abbott as a result of such business practices.

## FOURTEENTH CAUSE OF ACTION
### Negligent Misrepresentation
### (On behalf of all Classes)

238. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

239. Abbott marketed the Toddler Drinks in a manner conveying to reasonable consumers that the products promote general health and wellness, and provide specific health benefits, like immune support and digestive health.

240. Abbott's misrepresentations regarding the Toddler Drinks are material to a reasonable consumer because they relate to human health, both generally and specifically to immune support and digestive health. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase decisions.

241. Abbott acted in the ordinary course of its business and had a pecuniary interest in Plaintiffs and Class Members purchasing the Toddler Drinks.

242. Abbott owed a duty of care to Plaintiffs, not to provide false information when they were making purchase decisions regarding the Toddler Drinks.

243. Abbott knew or had been negligent in not knowing that the Toddler Drinks did not promote health, but instead, consuming sugar sweetened beverages, like the Toddler Drinks, harms rather than

supports overall health of the average consumer and harms rather than supports immune,

heart, and digestive health in particular. Abbott had no reasonable grounds for believing its

misrepresentations were not false and misleading.

244. Abbott intends that Plaintiffs and other consumers rely on these representations, as evidenced by

Abbott's intentional and conspicuous placement of the misleading representations on the Toddler

Drinks packaging.

245  Plaintiffs and Class Members have reasonably and justifiably relied on Abbott's

misrepresentations when purchasing the Toddler Drinks, and had the correct facts been known, would

not have purchased them at the prices at which they were offered.

246. Therefore, as a direct and proximate result of Abbott's negligent misrepresentations, ss and

Class Members have suffered economic losses and other general and specific damages, in the amount

of the Toddler Drinks' purchase prices, or some portion thereof, and any interest that would have

accrued on those monies, all in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
### Intentional Misrepresentation
### (On behalf of all Classes)

247. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in

full herein.

248.  Abbott marketed the Toddler Drinks in a manner conveying to reasonable consumers that the

Products promote general health and wellness, as well as providing specific health benefits, like

supporting immune support and digestive health. However, consuming sugar sweetened beverages like

the Toddler Drinks harms, rather than supports the overall health of toddlers and harms rather than

supports their health. Therefore, Abbott has made misrepresentations about the Toddler Drinks.

249. Abbott's misrepresentations regarding the Toddler Drinks are material to a reasonable consumer

because they relate to human health, both generally and specifically to immune support and

digestive health. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

250. At all relevant times, Abbott knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

251. Abbott intends that Plaintiffs and other consumers rely on these misrepresentations, as evidenced by its intentional and conspicuous placement of the misleading representations on the Toddler Drinks' packaging.

252. Plaintiffs and members of the Class have reasonably and justifiably relied on Abbott's intentional misrepresentations when purchasing the Toddler Drinks; had the correct facts been known, they would not have purchased the products at the prices at which the products were offered.

253. Therefore, as a direct and proximate result of Abbott's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Toddler Drinks' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated, pray for the entry of judgment against Defendant as to each cause of action, and the following remedies:

A. An Order declaring this action to be a proper class action, appointing Plaintiffs as class representatives, and appointing undersigned counsel as class counsel;

B. An Order requiring Defendant to bear the costs of class notice;

C. An Order enjoining Defendant from using any challenged labeling or marketing that is found to be false, misleading or unlawful;

D. An Order compelling Defendant to conduct a corrective advertising campaign;

E. An Order compelling Defendant to destroy all misleading and deceptive labels and advertising materials;

F. An Order requiring Defendant to pay restitution and to restore all funds acquired by means

of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising;

G. An Order requiring Defendant to pay compensatory, statutory and punitive damages where permitted by law;

H. An award of pre- and post-judgment interest where available;

I. An award of attorneys' fees and costs;

J. Such other and further relief as the Court deems necessary, just or proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 19, 2025                 Respectfully submitted,

**REESE LLP**

*/s/ Michael R. Reese*
Michael R. Reese
(Northern District of Illinois
General and Trial Bar No. 90785808)
100 West 93rd Street
New York, New York 10025
(212) 643-0500
*mreese@reesellp.com*

**REESE LLP**
Charles Moore (to be admitted *pro hac vice*)
121 N. Washington Ave., 2nd Floor
Minneapolis, Minnesota 55401
(212) 643-0500
*cmoore@reesellp.com*

**PUBLIC HEALTH ADVOCACY INSTITUTE**
Andrew Rainer (Admitted to Northern District of Illinois Bar)
360 Huntington Avenue, CU117
Boston, Massachusetts 02115
(617) 304-6052
*arainer@phai.org*

*Counsel for Plaintiffs and the Proposed Classes*